UNITED STATES of America,
Plaintiff,

v.

U.S. CURRENCY IN THE AMOUNT OF $119,984, Defendant.

No. CV–99–1978 (CPS).

United States District Court,
E.D. New York.

Jan. 17, 2001.

David L. Goldberg, United States Attorney's Office, Civil Division, Brooklyn, NY, for Plaintiff.

Simone Monasebian, Michael Kennedy, P.C., New York City, for Defendant.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

This is a civil forfeiture action brought by the United States to recover $119,984 that claimant Cesar Castro attempted to take out of the country without properly declaring it. Presently before this Court is the motion of claimants Castro and Maria Ansueto to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, their motion seeks judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure or summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The United States seeks production of documents used by the Court's probation department in preparing the presentence report in Castro's related criminal case, CR–96–1079.

For the reasons set forth below, claimants' motion for summary judgment is granted. The relief requested by the United States is denied.

## BACKGROUND

The following facts are taken from the submissions of the parties in connection with the instant motions and are undisputed unless otherwise noted. On November 22, 1996, claimant Cesar Castro was stopped by a customs inspector while attempting to board a flight bound for the Dominican Republic at Kennedy Airport. The customs inspector advised Castro orally of the requirement that he declare any United States currency on his person in excess of $10,000 and gave him a Spanish-language form to the same effect. Although Castro stated that he had only $2,000, a subsequent search revealed $119,984 in currency in his possession.

On December 5, 1996, Castro was charged in a two-count indictment of violating 31 U.S.C. §§ 5316 and 5322 [1] (Count

---

1. 31 U.S.C. § 5316 reads in relevant part:

[A] person or an agent or bailee of the person shall file a report under subsection

1) and 18 U.S.C. § 1001 (Count 2). *See United States v. Castro*, CR–96–1079 (CPS). On January 13, 1997, Castro entered into a plea agreement with Assistant United States Attorney James Tatum pursuant to which Castro would plead guilty to Count 1 of the indictment. The agreement stipulated that Castro would plead guilty to the crime of willful failure to report currency that was not illegal proceeds or to be used for illegal purposes. The plea agreement calculated Castro's base offense level at 6 points based on United States Sentencing Guidelines ("USSG") § 2S1.3(b)(2) (reducing the base offense level for a violation of the currency reporting requirements where "(B) the defendant did not act with the reckless disregard of the source of the funds; (C) the funds were the proceeds of a lawful activity; and (D) the funds were to be used for a lawful purpose."). On January 16, 1997, Castro pled guilty to Count 1 of the indictment pursuant to this agreement.

On March 11, 1997, after conducting an investigation into the details of Castro's case, the probation department issued a presentence report ("PSR"). After finding that the base offense level of Castro's violation of the currency reporting laws would be 12 points but that "[t]he defendant has provided proof that the funds were the proceeds of lawful activity, and they were to be used for a lawful purpose. Pursuant to [USSG § ] 2S1.3(b)(2), the offense level is decreased to level 6." (PSR ¶ 13.) The PSR reported that Castro explained that the currency was a loan from Maria Ansueto, the mother-in-law of his ex-wife, to allow him to purchase a house in Santo Domingo for his children. The PSR further stated that Castro provided documentary evidence that "seem[s] to support the fact that it was possible for Ms. Ansueto to be in possession of funds in the amount allegedly loaned to the defendant." (PSR ¶¶ 10–11.)

On March 27, 1997, Castro was sentenced by the Court. During the sentencing, the Court inquired whether the money was going to be forfeited. Castro's attorney informed the Court that the forfeiture proceedings were in abeyance pending the completion of the criminal case and that her client would likely commence a civil proceeding seeking the return of the money. The government stated that it had no position on forfeiture at that time. During the sentencing proceedings, the following colloquy ensued between the Court and Simone Monasebian, counsel for Castro in the criminal case against him:

THE COURT: [D]id you have something else you wanted to say?

MS. MONASEBIAN: Just that the defendant provided the proof that the funds were the proceeds of lawful activity and they were used for lawful purpose, and that is indicated on page 5 of the [presentence] report.

THE COURT: Well, I'm not making a finding on that. I will not prejudge the issue.

MS. MONASEBIAN: I understand, your Honor.

THE COURT: I mean, I don't have enough evidence here to find that the funds were the proceeds of or are to be used for any illegal purpose.

Well, I said that, but *then I see that* actually this sentence is based on a spe-

---

(b) of this section when the person, agent, or bailee knowingly—
(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
(A) from a place in the United States to or through a place outside the United States; or
(B) to a place in the United States from or through a place outside the United States.

31 U.S.C. § 5322 reads in relevant part:
A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 or 5324 of this title or a regulation prescribed under section 5315 or 5324) shall be fined not more than $250,000, or imprisoned for not more than five years, or both.

cific offense characteristic, which the defendant is entitled to upon a showing that he did not act with reckless disregard to the source of the funds, that the funds were the proceeds of lawful activity, and the funds were used for lawful purpose.

I have to say having read it, it doesn't make too much sense, since if the funds were the proceeds of lawful activity, I don't know what it means to say that the defendant did not act with the reckless disregard of the fact that they were the proceeds of lawful activity.

In any event, it seems to me he's entitled to this, if there's evidence to support that finding. The evidence recited in the probation report, and the government has not—is disputing—is not offering me any evidence in this proceeding to the contrary, Accordingly, I'm prepared to accept the conclusion of the Probation Department that this a case in which the offense level is appropriately decreased to a level six.

Whatever the impact of a government's failure to offer any proof to rebut this proffer by the defendant in the context of a criminal sentencing proceeding, may have in the context of a forfeiture proceeding, I leave to the finder of fact in the forfeiture proceeding.

I just want clear what's going on here, whether this will act as some kind of collateral estoppel or res judicata, I rather doubt, since the government's motivation in the context of sentencing is certainly quite different than its motivations in securing the forfeiture of money, but [I] might be wrong. Maybe this is an estoppel of some sort.

(Tr. of Sentence, CR–96–1079, Mar. 27, 1997, at 5–6.) The Court sentenced Castro

to two years' probation and ordered him to pay a $2,500 fine. On March 31, 1997, judgment was entered to that effect based on the factual findings of the PSR.

On March 18, 1999, after unsuccessfully attempting to recover the currency in question from the United States Customs Service and the Department of Justice, Castro and Ansueto filed a motion pursuant to Rule 41(e) seeking the return of the currency. On April 9, 1999, the government filed a complaint in rem for forfeiture of the currency pursuant to 31 U.S.C. § 5317. On the same date, this Court issued a warrant of arrest in rem for the currency. By order dated April 14, 1999, this Court converted the Rule 41(e) motion to a civil complaint pursuant to the Second Circuit's ruling in *Onwubiko v. United States*, 969 F.2d 1392 (2d Cir.1992). On July 20, 1999, the Court dismissed, without prejudice, the civil action, *Castro and Ansueto v. United States*, CV–99–1594 (CPS), due to the commencement of the forfeiture action. On September 9, 1999, Magistrate Judge Gold stayed discovery in this action pending the outcome of the motions presently before the Court.

## DISCUSSION

Claimants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or in the alternative for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).[2] If material outside the pleadings is considered, a motion under Rule 12(b)(6) may be considered a motion for summary judgment. *See* Federal Rule of Civil Procedure 12(b)(6); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988). When deciding whether summary judgment is appropriate, "[t]he essential inquiry is whether the ... [parties]

**2.** Claimants also move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. A motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is proper only after an answer to the complaint is filed. *See Taylor v. City of New York*, 953 F.Supp. 95, 97 (S.D.N.Y.1997); Charles

A. Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 1367, at 509–10 (2d ed.1990). Since claimants have not answered the complaint in the instant action, their motion for judgment on the pleadings is not properly before the Court and is accordingly denied.

... should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or [were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *In Re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985). In this case, both parties have proceeded as though this were a motion for summary judgment. They have submitted materials outside the scope of the pleadings, including a statement of undisputed material facts pursuant to Local Rule 56.1. As a result, this motion is appropriately treated as one for summary judgment.

Federal Rule of Civil Procedure 56(c) provides that summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of demonstrating the absence of any disputed material facts, and the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990).

The showing needed on summary judgment reflects the burden of proof in the underlying action. The court must consider "the actual quantum and quality of proof" demanded by the underlying cause of action and must consider which party must present such proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, where the ultimate burden of proof is on the nonmoving party, the moving party meets his initial burden for summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To survive the motion, the nonmoving party must then "make a showing sufficient to establish the existence of [the challenged] element essential to [that party's] case." *Id.* at 322, 106 S.Ct. 2548. While the court views the evidence in the light most favorable to the nonmoving party, *see O'Brien v. National Gypsum Co.,* 944 F.2d 69, 72 (2d Cir.1991), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. Rather, summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Collateral Estoppel

■ In support of their motion for summary judgment, claimants argue that litigation of the dispositive issue in this forfeiture action is barred by the doctrine of collateral estoppel. Specifically, claimants argue that, because this Court has already determined that the currency in question constituted the proceeds of lawful activity in the sentencing of Castro, the government is collaterally estopped from relitigating this issue. This is dispositive since currency derived from a legal source may not be subject to forfeiture because forfeiture in such circumstances would constitute an excessive fine under the Eighth Amendment. *See United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (holding that forfeiture of entire amount of currency, not connected to illegal activity and derived from a lawful source, seized as a result of failure to file a currency report under 31 U.S.C. § 5316 would violate the Excessive Fines Clause). Accordingly, claimants argue that the forfeiture action should be dismissed.

■ Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated by the same parties in a future lawsuit." *Schiro v. Farley,* 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). Collateral estoppel "applies when (1) the

issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *United States v. Hussein,* 178 F.3d 125, 129 (2d Cir.1999) (internal quotation marks omitted). The Court of Appeals for this Circuit has noted that precluding the litigation of findings made during sentencing preserves the integrity of the judicial process by eliminating inconsistent results. *See Securities Exchange Commission v. Monarch Funding Corporation,* 192 F.3d 295, 306 (2d Cir. 1999).

■■■ A guilty plea collaterally estops a claimant from relitigating, in a related forfeiture action, the underlying facts of his criminal violation. *See United States v. U.S. Currency in the Amount of $145,139,* 803 F.Supp. 592, 597 (E.D.N.Y.1992); *see also Adames v. United States,* 171 F.3d 728, 732 (2d Cir.1999) (holding that allocution at the time of a criminal plea constitutes a binding admission for the purpose of a subsequent challenge to the seizure of property). Where the criminal conduct that resulted in the plea agreement becomes the basis for a subsequent forfeiture proceeding, the plea of guilty constitutes an admission of all the elements required for an in rem forfeiture. *See United States v. $359,500 in U.S. Currency,* 828 F.2d 930, 931 (2d Cir.1987). A criminal defendant is also precluded from retrying issues "necessary" to his plea in a subsequent civil suit. *See United States v. Wight,* 839 F.2d 193, 195–96 (4th Cir.1987) (holding that, when a government official pleads guilty to using his official status to bring goods into a foreign country, he is collaterally estopped from disputing liability for purposes of the government's civil suit against him). Claimants argue that, based on these precedents, the government should be estopped from relitigating the issue of the source of the currency in question.

■■■ Collateral estoppel analysis begins with an analysis of whether the issues in Castro's sentencing and in the instant action are identical. The government argues that the issue in the instant forfeiture action is whether the funds in question were "unrelated to any other illegal activity," *see Bajakajian,* 524 U.S. at 338, 118 S.Ct. 2028, and that the issue decided at sentencing under USSG § 2S1.3(b)(2) was whether the currency at issue constituted the proceeds of lawful activity and was to be used for a lawful purpose. USSG § 2S1.3(b)(2). The distinction is a matter of semantics, and the government has not suggested any relevant relationship the money might have to illegal activity apart from having such activity as its source or being used for an illegal purpose. Accordingly, the issue in the present case and in Castro's criminal proceeding are identical for collateral estoppel purposes.

■■■ The government argues next that the issue of the currency's source was not "actually litigated and decided" in Castro's criminal case. The government bases its argument on the fact that it took no position on the source of the currency at issue during Castro's sentencing and that the Court stated that it would not prejudge the issue of the currency's source for the purposes of collateral estoppel. However, the Court simply stated that it was leaving undecided the issue now before it, whether Castro's plea of guilty and sentence constituted estoppel for purposes of a later forfeiture action. The Court did make a finding that the currency had a legal source and was not to be used illegally for the purpose of determining the sentence under USSG § 2S1.3(b)(2). The fact that the government did not dispute the proffer made by the defendant and adopted by the probation department does not mean that the issue was not actually litigated for purposes of collateral estoppel. *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 369 n. 4

(2d Cir.1995) (citing *Red Lake Band v. United States*, 221 Ct.Cl. 325, 607 F.2d 930, 934 (1979)) (holding that, since a stipulation of negligence was necessary to the court's determination of liability, the parties manifested an intent to be bound by the stipulation, deeming the issue "actually litigated" for collateral estoppel purposes). Thus, the issue of the legality of the currency's source was actually litigated and decided for collateral estoppel purposes in Castro's sentencing proceeding.

▮ The government also complains that it did not have a full and fair opportunity to litigate the source of the currency in question. At one level, the argument is frivolous. Given the government's participation in the criminal sentencing of Castro, it had a full and fair opportunity to litigate the issue of the source of the currency. *See United States v. Fatico*, 579 F.2d 707 (2d Cir.1978).

The government also argues that it did not have a full and fair opportunity to litigate the issue of the source of the currency based on the absence of sufficient incentive to litigate the issue. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). On this issue, the undersigned's initial reaction at the time of sentence was that the government did not have the same incentive to litigate the issue at sentencing that it has now to forfeit the money. However, to say that the government's incentive now and at the time of sentencing was "different" is not to say that it did not have a substantial motivation to litigate the issue in both contexts.[3] The government's desire to impose appropriate punishment for persons who secretly export the proceeds of illegal activity is at least as great if not greater than the need to add $120,000 to the United States Treasury.

▮ Finally, I consider whether collateral estoppel is appropriate. *See Monarch*, 192 F.3d at 307. In Castro's criminal case, the Court's finding about the currency's source was legally necessary under the USSG for the sentencing level of six points. *See* USSG § 2S1.3(b)(2). Preclusive effect will not be given to findings on "a collateral issue [that], although it may be the subject of a finding, is less likely to receive close judicial attention and the parties may well have only limited incentive to litigate the issue fully since it is not determinative." *Hussein*, 178 F.3d at 129 (internal citations omitted). Collateral estoppel based on findings made during sentencing "should be applied only in those circumstances where it is clearly fair and efficient to do so." *Monarch*, 192 F.3d at 306 (allowing for the application of collateral estoppel to findings made during sentencing at the district court's discretion when such an application does not threaten fairness and judicial efficiency). Castro was sentenced on March 27, 1997 and, despite his efforts to recover the currency, which included both administrative action and a Rule 41(e) motion, the government took no action to force a resolution on the dispute over the currency until filing the instant action, two years after Castro's sentencing. It is here clearly fair and efficient to give preclusive effect to the findings with respect to the source and use of the currency.

Accordingly, for the reasons set forth above, the government is estopped from relitigating the source of the currency at issue.

### Excessive Fines Clause

Since the government is estopped from relitigating the source of the currency, the Court must determine whether claimants are entitled to summary judgment in this action based on the Supreme Court's hold-

---

**3.** It might be argued that the undersigned's statement that "I rather doubt" that collateral estoppel will apply deprived the government of any incentive to litigate the issue. Even if such microscopic examination of a litigant's state of mind in the prior proceeding were appropriate in collateral estoppel analysis the effect of the Court's words was undoubtedly blunted by the statement, "but I might be wrong."

ing in *United States v. Bajakajian*, 524 U.S. at 321, 118 S.Ct. 2028. The Supreme Court in *Bajakajian* considered the question of whether a sentencing court may order a criminal defendant who was convicted of failure to report currency, lawful in its origin, in violation of § 5316, to forfeit the full amount of the currency pursuant to 18 U.S.C. § 982(a)(1), a criminal statute. In reaching its holding that the full forfeiture of the currency in that case pursuant to § 982 would violate the Excessive Fines Clause, the Supreme Court first determined that the forfeiture under § 982 was a punitive, criminal in personam forfeiture, rather than a nonpunitive, traditional civil in rem forfeiture. Only upon concluding that the forfeiture was punitive and thus a "fine" within the meaning of the Excessive Fines Clause, did the Supreme Court turn to the question of whether the forfeiture was excessive.

▮▮▮▮ While the instant action involves a civil forfeiture statute, 31 U.S.C. § 5317,[4] the *Bajakajian* analysis is applicable. For the purposes of the Excessive Fines Clause analysis, the question is not whether the forfeiture is civil or criminal, but whether it is punishment and, if so, whether the punishment is excessive. *See Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); and *United States v. $359,500*, 25 F.Supp.2d 140, 147–48 (W.D.N.Y.1998); *see also United States v. $64,000*, No. 97–C–5363, 1999 WL 135299 (N.D.Ill. Mar. 10, 1999).

"[F]orfeiture generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment." *Austin*, 509 U.S. at 618, 113 S.Ct. 2801. Further, civil forfeiture upon a violation of the currency reporting re-

quirements induces discovery of unreported taxable income and deters money laundering, *see United States v. $145,139*, 803 F.Supp. at 597; such deterrence "has traditionally been viewed as a goal of punishment." *Bajakajian*, 524 U.S. at 329, 118 S.Ct. 2028. Moreover, civil forfeiture under § 5317 "is not limited by the extent of the government's loss (see 31 U.S.C. § 5317(c)), and it is tied to the commission of a crime (violation of 31 U.S.C. § 5316)." *United States v. $273,969.04*, 164 F.3d 462 (9th Cir.1999); *see also Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). Forfeiture based on failure to comply with the currency reporting statutes "does not serve the remedial purpose of compensating the Government for a loss." *Bajakajian*, 524 U.S. at 329, 118 S.Ct. 2028. For these reasons, I conclude that forfeiture in this case is punitive. *See Hudson*, 522 U.S. at 99, 118 S.Ct. 488; *see also United States v. $359,500*, 25 F.Supp.2d at 147–48.

▮▮▮▮ The next question is whether forfeiture of the $119,984 is excessive. *See Bajakajian*, 524 U.S. at 334, 118 S.Ct. 2028. The applicable test under *Bajakajian* is whether the forfeiture is "grossly disproportional to the gravity of a defendant's offense." *Id.* Under this test, the court "must compare the amount of the forfeiture to the gravity of the defendant's offense." *Id.* at 336–37, 118 S.Ct. 2028. Where there is no evidence indicating a relation to other crimes, as is the case here, a simple nonreporting offense under § 5316 is not very grave. *See id.*

In deciding whether the forfeiture before it was grossly disproportional to the offense, the *Bajakajian* Court considered the nature and extent of the criminal activity, its relation to other crimes, its penalties, and the harm it caused. First, the

---

4. 31 U.S.C. § 5317 reads in relevant part:
   If a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property, in-

cluding a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government.

31 U.S.C. § 5317(c).

Court noted that the crime at issue was "solely a reporting offense," explaining that transporting currency out of the country is lawful as long as the currency is reported. *Bajakajian*, 524 U.S. at 337, 118 S.Ct. 2028. Second, the Court emphasized that this "single" reporting offense, *id.* at 337 n. 12, 118 S.Ct. 2028, "was unrelated to any other illegal activities"— the currency was produced by and used for legal activities. *Id.* at 338, 118 S.Ct. 2028. Third, the Court focused on the penalties for the offense. It recognized that the maximum statutory penalty (a $250,000 fine and five years' imprisonment) was "certainly relevant evidence" of the offense's gravity but determined that "the maximum sentence that could have been imposed on [Bajakajian]" under the Sentencing Guidelines (a $5,000 fine and six months' imprisonment) "confirm[ed] a minimal level of culpability" in Bajakajian's case. *Id.* at 338–39 & n. 14, 118 S.Ct. 2028. Finally, the Court determined that the harm caused by the offense was also minimal:

> Failure to report his currency affected only one party, the Government, and in a relatively minor way. There was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.

*Id.* at 339, 118 S.Ct. 2028. For these reasons, the Court held that the forfeiture of $357,144 for a single reporting violation, unrelated to any other illegal activity, and harming only the United States "in a relatively minor way," constituted an excessive fine in violation of the Eighth Amendment.

In this case, Castro pled guilty to a reporting offense. The currency had a legal source and was to be used for a legal purpose. In pleading guilty to the currency reporting offense, Castro was subject to the same criminal liability as the defendant in *Bajakajian.* See USSG §§ 2S1.3(b) & 5E1.2(c)(3). As in *Bajakajian*, the harm to the government in this case was minimal, since it was merely deprived of the information that $119,984 had left the country.

■ The forfeiture of the entire $119,984 would constitute the kind of sanction that is grossly disproportionate to the crime. Thus, the forfeiture of the currency would constitute an excessive fine based on the holding in *Bajakajian* and is impermissible. Accordingly, summary judgment is granted to claimants, and the complaint against the currency at issue is dismissed.[5]

### Rule 56(f)

The government urges that claimants' motion for summary judgment be denied as premature, since no discovery has been conducted in this case. The government seeks evidence relating to the source and legitimacy of the currency at issue, an issue that has been collaterally estopped by the sentencing findings in the underly-

---

5. Claimants also argue that forfeiture of the currency in question would violate the Double Jeopardy Clause of the Fifth Amendment. The Court need not consider this argument since claimants' motion for summary judgment is granted. However, it should be noted that the Supreme Court has held that the Double Jeopardy Clause does not bar the institution of a civil in rem forfeiture action after the criminal conviction of a defendant. *See* Bajakajian, 524 U.S. at 331, 118 S.Ct. 2028; *United States v. Ursery*, 518 U.S. 267, 270–71, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (civil forfeitures generally do not constitute "punishment" for purposes of the Double Jeopardy Clause). Also, forfeiture actions brought under 31 U.S.C. § 5317 after a criminal conviction have been held not to constitute punishment and therefore do not violate the Double Jeopardy clause. *See* $273,969 U.S. Currency, 164 F.3d at 465. It should also be noted that a civil sanction that does not implicate the Double Jeopardy Clause may still be punitive for purposes of the Excessive Fines Clause. *See Hudson*, 522 U.S. at 103, 118 S.Ct. 488; *see also Ursery*, 518 U.S. at 287, 116 S.Ct. 2135 (the forfeitures at issue, while not considered punishment under the Double Jeopardy Clause, must nevertheless be reviewed for excessiveness under the Excessive Fines Clause); *$273,969 U.S. Currency*, 164 F.3d at 466.

ing criminal case. Accordingly, the government's motion under Rule 56(f) is denied.

### CONCLUSION

For the reasons set forth above, claimants' motion for summary judgment is granted. Claimants are directed to settle a judgment on notice in accordance with this opinion within thirty days of the date hereof.

The Clerk is directed to furnish a filed copy of the within to all parties.

SO ORDERED.